Charles H. Gaffney, S.
The account of the executors of the last will and testament and codicil of Louis Spiegel was filed in this court on July 31,1957. Several objections to the account were subsequently filed. After protracted hearings and voluminous testimony many of the objections to the account have been settled by stipulation. There still remain certain objections to be decided together with a construction of paragraph fifteenth of testator’s will.
On September 2, 1954, 'Beckie Spiegel, testator’s widow, filed a verified claim against the estate contending that she was a legal partner with her husband in several different business enterprises operated by her husband. She had previously filed a right of election to take against the provisions of the will under section 18 of the Decedent Estate Law. Testator had conducted a feed business for about 20 years and had operated a butcher shop for many years up until the time of his death. In addition to these enterprises he had also conducted a real estate business. The widow claims that she worked very hard in all of her husband’s business endeavors. All the parcels of real property owned by the testator and all of his savings accounts, securities, stocks and other assets were held in his *115 own individual name. The widow contends that because she assisted her husband in all of his business efforts she was a legal partner with her husband and, therefore, is entitled to one half of all of his assets and that her one half constitutes no part of her husband’s estate. The proof adduced by the widow to support her contention that she was his partner falls far short of supporting her claim. The principal testimony to support her position was given by her daughter, Mollie Englander, and her son-in-law, A1 Englander. Mollie’s testimony in this regard was that the decedent had said to his wife, ‘ ‘ you work hard and you can have everything, you can sign checks and have the same rights that I have. If you want anything you can have it without asking me.” This surely proves the great love and devotion which the decedent bore towards his wife as well as appreciation for her assistance. However, it does not establish an agreement to consider her as a business partner with all the effects and consequences which the law implies in such relationship. A1 Englander’s testimony was substantially as follows: ‘ ‘ He [testator] said that my wife, Mollie, and I were working partners just like his wife was to him * * * that she was always at his side and taking care of the business like any partner would be.” A1 Englander further testified that decedent said, ‘ my wife always helped me and worked Avith me side by side in that respect she was a partner in different things.” Generic statements such as these cannot establish a legal partnership and reveal that the mdow simply was a helpmate and a loving and devoted wife. It is customary for a husband to give oral praise to a devoted wife and refer to her as a “partner” Avithout creating the legal partnership sought to be established herein. The claim of Beckie Spiegel that she was a legal partner in her husband’s businesses is denied.
Under Schedule A of the account of the executors there are set forth under ‘ ‘ Cash in banks ’ ’ 11 interest accounts all in the name of decedent having total balances of $16,833.06. A1 Eng-lander and Mollie Englander filed objections to this schedule of account and claim that the accounts and the funds on deposit represented thereby were the subject of a gift made by the decedent prior to his death to A1 Englander and Mollie Englander. The decedent left him surviving, besides his widow, seven children. Mollie Englander is the only child of the decedent who is not given a cash legacy under the mil but her husband, A1 Englander, was named one of the executors under the mil. The attorney for the decedent who drew the mil and attended its execution stated that when Mr. Spiegel executed *116 the will he said that he had another daughter, Mollie Englander, but she was not mentioned in the will because he had taken care of her in another way. There was introduced in evidence the following letter addressed to “Mister A1 Englander, 21 New Main St., Haverstraw, N. Y.”
March 1, 1951
Dear Children,
I want you to know that I have written a letter via air mail to the man (I mentioned) Mr. A. Bender, of 23 Nachmani St. in Tel Aviv.
Now I am writing you so that you should know what I have “for you.” I have divided up among 10 (separate) Bank deposits, since I don’t keep these books in my box in the bank, but instead in my own safe. I’m writing you the names of the banks in which the money is deposited. (I’ve done this) so that they won’t take large taxes “from you.”
1. Roundout Savings Bank in Kingston
2. Ulster County Trust, Kingston
3. Kingston Savings Bank
4. Harlem Savings Bank, 125th St. N. Y.
5. Kerhonkson Bank
6. Williamsburg Savings Brooklyn
7. Kings County Savings Brooklyn
8. Bowery Savings Bank, N. Y.
9. Manhattan Savings Bank, N. Y.
10. Dry Dock Savings Bank, 3rd St. in N. Y.
I do hope to God that I will live to travel to Israel, but a human being is never sure of his life in his later years. Thats why I want you to know that the bonds and policies are in the bank deposit box.
Regards to you &> the children. Keep this letter in your safe, for “ until after 120 healthy years” — and have a great deal of “Nachos”.
Your father Leib Spiegel March 1, 1951
The letter was written March 1, 1951, in Yiddish and was translated by two witnesses. The witnesses disagreed as to the meaning of the phrases “ for you ” and “from you”. They agreed substantially on the translation of the rest of the letter.
There was also put into evidence a second letter dated January 30, 1951, which read in part as follows:
Jan 30, 1951
Dear Abraham
I am writing to you in order that you may know what my wish is after my life. Keep this in your deposit box, as long as God will allow me to live.
I have ritual shrouds which I personally bought — which I keep in Kerhonkson, and my prayer shawl in which I prayed for 415 years — which I want used, my personal possession. I have sent $150 to a man in order that he purchase a plot in Jerusalem near my father’s grave. The name of the man is Rabbi Abraham Bender 23 Mechanic St. Tel Aviv, Israel. * * *
Naturally, the body will require a vault or else be buried in the Cemetery where I and my children belong with this condition the body will be removed from the place and sent to Jerusalem and I think before burial it will be .required to embalm, in order to transport it on the Boat. * * *
*117 My son David knows where to inquire. I have spoken to him and knows what is required for this $800, for sending the body via a boat and it will be necessary to send a wire to the society. They must send papers confirming that they will receive the body. Otherwise the body cannot be shipped.
Send also $50 additional to the man for expenses and he should send me the deed. I hope to God that I will live long enough and I will send you the deed, also that in the meanwhile it should be in your safe. * * *
In event that one child wants to travel (accompany the body) let him travel at my expense and since God has helped me and I have provided money in the will for it, since I have enough for all of it.
The first requisite of a valid causa mortis gift is intention by decedent to create same. Even deleting the foregoing two phrases, of the first letter, disputed by the interpreters, these letters show an intention to make a gift. Such intention was further established by statements made by him to his wife, Beckie, about a year prior to his death. On that occasion he showed Beckie a lunch box kept in the safe at his home which contained 11 bankbooks and a letter addressed to Mollie and A1 Englander listing 10 bank accounts and told her that it was for Mollie and Al and instructed her to give it to them if anything happened to him. These statements combined with the detailed personal information outlined in both letters are certainly congruous with the requisites necessary to make a causa mortis gift.
Thereafter, on the Sunday preceding his death the decedent, in the presence of Mrs. Spiegel, Mrs. Cooperstein, Mollie and A1 Englander, stated with reference to the same lunch box, “ you all know this is for Mollie and Al.” This statement made such a short time before his death would certainly reaffirm his intention to make this gift.
The second requisite of a causa mortis gift is that the gift must be made with a view of the donor’s death. This requirement was fulfilled by testimony that decedent had suffered from a heart condition for some time which ultimately caused his death. The letter of March 1,1951, referred to the fact that a human being is never sure of his life in later years and the letter of January 30, 1951, outlines detailed preparations for the shipment of his body to Jerusalem for burial, the purchase of ritual shrouds and a plot so that burial near his father’s grave could be accomplished. The reading of these letters clearly demonstrates that the decedent’s statements were motivated by thoughts of impending death.
The third requirement of a gift causa mortis, viz., that the donor must die of that ailment or peril, has been met by proof that in fact the decedent died of a heart seizure.
*118 The fourth element of a gift causa mortis, requiring delivery, has been met by proof of the instructions of the decedent to his wife that she was to deliver the bankbooks to Mollie Englander and A1 Englander if anything happened to him. The rule of delivery is well stated in the American Law Reports (Ann. 60 A. L. R. 1054, 1057): “ only such a delivery is required as the nature of the thing given and the circumstances under which it is given will permit. Thus, it is now generally held that the thing given may be delivered to the donee directly, or to some designated person for him, and the delivery may be either actual, constructive, or symbolical. ’ ’ The delivery in the instant case was to Mrs. Spiegel and although constructive was sufficient compliance with the aforesaid rule. The rule that delivery may be made to a third person was well settled in Grymes v. Hone (49 N. Y. 17).
The proof by executors as to withdrawals and deposits by decedent after the letter of March 1, 1951, is not sufficient to revoke the foregoing gift. No such withdrawals or deposits occurred between Sunday night when the decedent last referred to the gift in question and the following Wednesday when he died. The further contention of executors that one bankbook was found in the lunch box that was not included on the list contained in the letter of March 1, 1951, is likewise insufficient to negate the gift because the decedent referred to the entire contents of the lunch box in making and confirming the gift. The claim of Mollie and A1 Englander as donees of the bank accounts in question is therefore allowed.
As to the widow’s claim that a bank account in the Kerhonkson National Bank in the sum of $874.71 was a joint account, the hank records and the testimony of the president of the bank clearly show that this was not a joint account and that the form of such account as set forth in the Banking Law was not complied with. This claim is denied.
Under the will real property located on Main Street, Kerhonkson, was devised to Sylvia Cooperstein and a parcel of real property contiguous with the property given to Sylvia Cooperstein was devised to Martha Malkin. Because of certain combined features both parcels have been sold in one sale for the total price of $22,000. A qualified appraiser testified that the portion of real estate devised to Martha Malkin was valued at $10,500 and the parcel devised to Sylvia Cooperstein was valued at $11,500. The proceeds of the gale should be divided according to the foregoing appraisal,
*119 Paragraph fifteenth of the will reads as follows: ‘ fifteenth: I give, bequeath and devise to my daughter, Anna G-utterson, the bungalow and the lands upon which it is erected, situated on Maple Avenue, Kerhonkson, New York, being the premises often identified and known as the Schoonmaker property for her own use and the use of her heirs and assigns forever, except that I direct that my wife Becky Spiegel shall have the life use thereof so long as she shall remain alive.”
In addition to the bungalow mentioned in the fifteenth paragraph there was also located on the premises a dwelling house containing three apartments which was attached to the bungalow referred to in the will. All of the real property, including the dwelling house attached to the bungalow, passed under the fifteenth paragraph of the will. It is inconceivable that the testator intended to dispose of part of the premises in view of the fact that he referred to the entire property as the Schoonmaker property. This reference indicates that his intention was to dispose of all of the former Schoonmaker property under this paragraph of his will.
This entire parcel has been sold pursuant to an order of this court. Therefore, the proceeds of the sale of this property should be divided between the life tenant, Beckie Spiegel, and the remainderman, Anna Gutterson, computed on the age of Beckie Spiegel as of the date of decedent’s death in accordance with the American Experience Table of Mortality, subject, of course, to the rights of the surviving spouse which are still to be determined under her right of election.
Submit decree in accordance with this opinion, at which time attorneys’ fees, special guardian’s allowance, the widow’s right of election and ultimate distribution can all be determined.